Caleb Marker (SBN 269721)
Caleb.Marker@zimmreed.com
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

*Counsel for Relator*

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 0 2022

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,
THE STATE OF CALIFORNIA,
ex rel. [UNDER SEAL],

               Plaintiffs,

v.

[UNDER SEAL],

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.** CV20-09472-CBM (ASx)

**FIRST AMENDED COMPLAINT**

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

Caleb Marker (SBN 269721)
Caleb.Marker@zimmreed.com
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

*Counsel for Relator*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,
THE STATE OF CALIFORNIA
ex rel. BAY AREA WHISTLEBLOWER
PARTNERS,

               Plaintiffs,

v.

RENEW HEALTH GROUP, LLC,
RENEW HEALTH CONSULTING
SERVICES, LLC, and CRYSTAL
SOLORZANO,

               Defendants.

**Case No.** CV20-09472-CBM (ASx)

**FIRST AMENDED COMPLAINT**

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

1.      Plaintiff-Relator Bay Area Whistleblower Partners ("Relator") brings this action on behalf of the United States of America and the State of California against Renew Health Group, LLC, Renew Health Consulting Services, LLC, and Crystal Solorzano (together, "Renew" or the "Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"), and the California False Claims Act, Cal. Gov't. Code §§ 12650 *et seq*. (the "CA FCA"), to recover all damages, civil penalties and all other recoveries provided for under those statutes.

## I.      INTRODUCTION

2.      This action concerns the submission by Renew of false claims for payment to the United States and the State of California for healthcare benefits under Medicare and California's Medicaid Program, "Medi-Cal."

3.      In response to the COVID pandemic, the Centers for Medicare & Medicaid Services ("CMS") issued limited waivers ("COVID Waivers") of certain requirements for Medicare coverage of skilled care provided by skilled nursing facilities ("SNFs").  Under the Medicare Part A SNF benefit, CMS will pay SNFs a daily rate for the care of a beneficiary who has medical conditions that require skilled treatment on a daily basis. Medi-Cal will cover the Medicare co-payments for beneficiaries who qualify for both Medicare and Medicaid.

4.      The COVID Waivers temporarily removed two requirements for coverage under the Part A SNF benefit – the requirement that a beneficiary complete a 3-day hospital stay and the requirement that a beneficiary end a "spell of illness" before

beginning a new benefit period. The express purpose of the COVID Waivers was to ensure that beneficiaries who met the core medical necessity requirement for the Part A SNF benefit were not excluded from coverage due to circumstances caused by the COVID pandemic. The COVID Waivers were not designed to expand the scope of the Part A SNF benefit and were based on a finding by CMS that they would not increase costs to Medicare.

5.    The COVID Waivers did not, and could not under federal law, waive the core medical necessity requirement for the Part A SNF benefit that the beneficiary actually require skilled treatment on a daily basis.

6.    Almost immediately after CMS issued the COVID Waivers, Renew implemented a scheme to fraudulently bill Medicare under the Part A SNF benefit for nearly every Medicare-eligible resident in its approximately 27 facilities across California. Treating the COVID Waivers as a blank check, Renew management ignored the clear language of the COVID Waivers and federal law, and the concerns of certain employees that objected to this scheme, and has for months billed Medicare Part A millions of dollars for treatment that it knows is not covered.

7.    As the COVID pandemic surged again in 2021, Renew has continued to engage in its fraudulent scheme and to use any available pretext to conceal it from the government. As just one example, Renew has used a single positive COVID test of an asymptomatic staff member as the reason for billing all residents of that facility as requiring and receiving skilled services.

4

8.     Indeed, at all relevant times Renew has maintained a log of residents who do not meet the medical necessity requirement for skilled care but whose stays Renew has nonetheless billed to Medicare and Medi-Cal.  As of the filing of the initial complaint in this action, approximately 900 residents were listed on this log.

9.     Renew was well aware of the fact that the COVID Waivers were not designed to provide SNFs with extra revenue to cover COVID-related costs.  Indeed, Renew applied for and received $10 million from CMS under a separate program designed for that exact purpose.  And Renew applied for and received over $14 million in federal Paycheck Protection Program loans for itself and numerous facilities under its ownership or control.

10.     Renew also applied for and received $21 million from CMS under a program designed to provide prepayments to healthcare providers to address the concern that providers' revenues would decrease as a result of the COVID pandemic.  However, due to its fraudulent practices, Renew's Medicare revenues *increased* during the COVID pandemic.

11.     The actions of Renew have undermined the government's response to the COVID pandemic and have defrauded the United States and the State of California of many millions of dollars in improperly obtained and retained payments.

## II.     JURISDICTION & VENUE

12.     Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq*., specifically 31 U.S.C. §§ 3732(a) & (b) and 28 U.S.C. §§ 1331 and 1345.  This Court has

supplemental jurisdiction over the CA FCA claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

13.    The Court may exercise personal jurisdiction over the Defendants because they transact business in this District, engaged in the alleged illegal activities and practices in this District, and are located in this District.

14.    Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

### III.    PARTIES

#### A.    Plaintiffs

15.    The United States is a real party in interest to the claims in this action. Through the Centers for Medicare & Medicaid Services, the United States administers the Medicare and Medicaid programs.

16.    The State of California is a real party in interest to the claims in this action. The State of California administers the Medi-Cal program to provide Medicaid benefits to covered California residents.

17.    Relator Bay Area Whistleblower Partners is a Delaware partnership.  The partners of Relator have direct knowledge of the facts alleged in this complaint.

#### B.    Defendants

*Renew Health Group, LLC and Renew Health Consulting Services, LLC*

18.    Defendant Renew Health Group, LLC is a California limited liability company with its principal office located at 107 W. Lemon Ave., Monrovia, CA 91016.

6

19.     Defendant Renew Health Consulting Services, LLC is also a California limited liability company with its principal office located at 107 W. Lemon Ave., Monrovia, CA 91016.

20.     Renew Health Group, LLC and Renew Health Consulting Services, LLC operate as a single business enterprise.  According to Renew's website, its "centers offer a full spectrum of post-hospital stay services that you may need following a hospital discharge."  Renew Website, available at http://renewhg.com/.

21.     Renew owns and/or operates approximately 27 facilities in the State of California, including:

(a)     Orinda Care Center LLC, 11 Altarinda Road, Orinda, CA 94563
(b)     Riverside Heights Healthcare Center LLC, 8951 Granite Hill Drive, Riverside, CA 92509
(c)     Arrowhead Healthcare Center LLC, 4343 N. Sierra Way, San Bernardino, CA 92407
(d)     Griffith Park Rehabilitation Center LLC (d/b/a Griffith Park Healthcare Center), 201 Allen Avenue, Glendale, CA 91201
(e)     Parkwest Rehabilitation Center LLC (d/b/a Parkwest Healthcare Center), 6740 Wilbur Avenue, Reseda, CA 91335
(f)     Santa Fe Heights Healthcare Center LLC, 2309 N. Santa Fe Avenue, Compton, CA 90222
(g)     Simi Valley Healthcare Center LLC (d/b/a Simi Valley Care Center), 5270 E. Los Angeles Avenue, Simi Valley, CA 93063
(h)     Hyde Park Rehabilitation Center LLC (d/b/a Hyde Park Healthcare Center), 6520 West Blvd., Los Angeles, CA 90043
(i)     Rehabilitation Center of Orange County LLC (d/b/a Healthcare Center of Orange County), 9021 Knott Avenue, Buena Park, CA 90620[1]
(j)     Redwood Healthcare Center LLC, 3145 High Street, Oakland, CA 94619

---

[1] This entity may also be referred to by Renew as "Retirement Center of Orange County."

7

(k)   Lake Merritt Healthcare Center LLC, 309 MacArthur Boulevard, Oakland, CA 94610

(l)   Valley Vista Nursing and Transitional Care LLC, 6120 N. Vineland Avenue, North Hollywood, CA 91606

(m)   Pomona Valley Rehabilitation Center LLC, 250 W. Artesia Street, Pomona, CA 91768

(n)   Canyon Vista Post Acute LLC, 20554 Roscoe Blvd., Canoga Park, CA 91306

(o)   Silicon Valley Post Acute LLC (d/b/a Herman Health Care Center), 2295 Plummer Avenue, San Jose, CA 95125

(p)   Asistencia Villa Post Acute LLC (d/b/a Asistencia Villa Rehabilitation and Care Center), 1875 Barton Road, Redlands, CA 92373

(q)   Route 66 Post Acute LLC, 638 E. Colorado Avenue, Glendora, CA 91740

(r)   La Mesa Post Acute LLC, 9333 La Mesa Drive, Alta Loma, CA 91701

(s)   San Antonio Post Acute LLC, 867 E. 11th Street, Upland, CA 91786

(t)   Pacific Park Healthcare Center LLC, 525 S. Central Avenue, Glendale, CA 91204

(u)   The Lake Post Acute LLC, 3710 W. Tulare Avenue, Visalia, CA 93277

(v)   Tulare Lake Post Acute LLC, 604 E. Merritt Avenue, Tulare, CA 93274

(w)   Tule River Post Acute LLC, 1100 W. Morton Avenue, Porterville, CA 93257

(x)   Twin Oaks Post Acute LLC, 897 N. M Street, Tulare, CA 93274

(y)   Miracle Mile Post Acute LLC, 1020 S. Fairfax Avenue, Los Angeles, CA 90019

(z)   Twin Oaks Assisted Living LLC, 999 N. M Street, Tulare, CA 93274

(aa)   San Gabriel Post Acute LLC, 6812 Oak Avenue, San Gabriel, CA 91775

*Crystal Solorzano*

22.    Defendant Crystal Solorzano is the owner and Chief Executive Officer of Renew. She founded Renew in or around 2014 after receiving a $650,000 severance payment from a previous nursing home employer. She has directed Renew's expansion from six facilities in 2015 to over two dozen today.

23.    Ms. Solorzano controls Renew. Specifically, she is involved with and has final authority over all major business decisions of Renew, including capital and

operating expenditures, billing and accounts receivable (such as Medicare and Medicaid revenue), hiring and firing of senior management, and public relations.  It is the general practice of Renew's senior management to copy Ms. Solorzano on every important email dealing with financial issues.  Ms. Solorzano has and exercises supervisory authority over all senior management of Renew.

24.    Specifically, with regard to the allegations in this Complaint, Ms. Solorzano participated in weekly video-conference meetings beginning in March 2020 in which Renew's fraudulent scheme was discussed.

25.    Ms. Solorzano is the public face of Renew and frequently gives media interviews and statements, and she presides over company-wide conferences in which she identifies herself as Renew's "CEO and President."

26.    It has been reported that from 2016 through 2019, the facilities owned or controlled by Ms. Solorzano received over $425 million from Medicare and Medicaid.

27.    A large percentage of these taxpayer dollars has by all appearances not been used to provide services to facility residents.  Instead, on information and belief, Ms. Solorzano has for years improperly diverted millions of dollars away from the facilities she controls, to the severe detriment of patient care, in order to enrich herself personally.

28.    For instance, Ms. Solorzano, who as of 2009 was employed as an administrator of a single nursing facility, now personally owns three California homes together worth over $11 million.

# IV.    LEGAL BACKGROUND

**A.    The Federal False Claims Act And California False Claims Act**

29.    The federal FCA imposes liability on any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
* * *
(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. §§ 3729(a)(1)(A), (B) & (G).

30.    The term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that … is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).

31.    The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required.  *See* 31 U.S.C. § 3729(b)(1)(B).

32.    Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus civil penalties.  The FCA civil penalties are $5,500 to $11,000 for violations occurring from September 29, 1999 to August 1, 2016; $10,781 to $21,563 for violations occurring from August 2, 2016 to February 3, 2017; $10,957 to $21,916 for violations occurring from February 4, 2017 to January 29, 2018; $11,181 to $22,363 for violations occurring from January 30, 2018 to June 19, 2020; and $11,665 to 23,331 for violations occurring thereafter.  *See* 28 C.F.R. §§ 85.3 & 85.5; 85 Fed. Reg. 37004 (June 19, 2020).

33.    The CA FCA provides in pertinent part that any person who:

(1)    knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; or

(2)    knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

\*\*\*

(7)    knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision; or

(8)    is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim,

is liable to the State for treble damages and such penalties as are allowed by law. Cal. Gov. Code §§ 12651(a)(1), (2), (7), and (8).

34.    The CA FCA further provides that "knowing" and "knowingly" mean that a person, with respect to information:

(A) has actual knowledge of the information; or

(B) acts in deliberate ignorance of the truth or falsity of the information; or

(C) acts in reckless disregard of the truth or falsity of the information,

and requires no proof of specific intent to defraud. Cal. Gov. Code § 12650(b)(3).

35.    Section 12651(a) of the CA FCA provides that a person is liable to the State or political subdivision for three times the amount of damages that the State or subdivision sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

36.    The term "material" under the CA FCA means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. Cal. Gov. Code § 12650(b)(4).

37.    The term "obligation" under the CA FCA means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. Cal. Gov. Code § 12650(b)(5).

## V.    FACTUAL ALLEGATIONS

**A.    General Requirements For Medicare And Medicaid Coverage Of Skilled
Nursing And Rehabilitation Services**

38.    Congress established the Medicare Program in 1965 to provide health
insurance coverage for people age 65 or older and for people with certain disabilities or
afflictions.  *See* 42 U.S.C. §§ 426, 426a.

39.    The Medicare program is divided into four "Parts" that cover different
services.  Inpatient hospital services, home health and hospice care, and skilled nursing
and rehabilitation care are covered under Part A.

40.    Medicaid is a government health insurance program for the poor that is
jointly funded by the federal and state governments.  *See* 42 U.S.C. §§ 1396 *et seq.*  Each
state administers its own Medicaid program.  However, each state program is also
governed by federal statutes, regulations, and guidelines.  The federal portion of each
state's Medicaid payment – the Federal Medicaid Assistance Percentage – is based on
that state's per capita income compared to the national average.  If a beneficiary is
dually-eligible for both Medicare and Medicaid, their state's Medicaid program will often
cover Medicare co-insurance or co-payment amounts related to skilled care. Accordingly,
each state Medicaid program that covers dual-eligible patients is a "grantee" of federal
funds under the FCA.  31 U.S.C. § 3729(b)(2)(A)(ii).  Therefore, when these state
programs cover patients' co-insurance or co-payments, false claims submitted for
payments may give rise to FCA liability.

41.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

42.     In order for skilled nursing or rehabilitation services provided in a skilled nursing facility to be covered by Medicare Part A, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

43.     Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled nursing or rehabilitation therapy services at regular intervals thereafter.  *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4 § 40.3; Medicare Benefit Policy Manual, Ch. 15 § 220.1.3.

44.     For a service to be considered skilled, it must be "so inherently complex that it can safely and effectively be performed only by, or under the supervision of, professional or technical personnel."  42 C.F.R. § 409.32(a).  Thus, skilled nursing or

14

rehabilitation services can only be administered by, or under the supervision of, trained

personnel such as registered nurses, physical therapists, occupational therapists, or speech

language pathologists. *See* 42 C.F.R. § 409.31(a).

45.    Skilled rehabilitation therapy generally does not include personal care

services, such as the general supervision of exercises that have already been taught to a

patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait,

maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d); *see

also* Medicare Benefit Policy Manual, Ch. 8 § 30.4.1.1 ("Skilled physical therapy

services must ... be of a level of complexity and sophistication, or the condition of the

patient must be of a nature that requires the judgment, knowledge, and skills of a

qualified physical therapist.").

46.    Medicare will only cover those services that are "reasonable" and

"necessary." *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A

or part B of this subchapter for any expenses incurred for items or services ... which ...

are not reasonable and necessary for the diagnosis or treatment of illness or injury or to

improve the functioning of a malformed body member.").

47.    In the context of skilled nursing or rehabilitation therapy, "reasonable" and

"necessary" means that the services must be: (1) consistent with the nature and severity

of the patient's individual illness, injury, or particular medical needs; (2) consistent with

accepted standards of medical practice; and (3) reasonable in duration and quantity. *See*

Medicare Benefit Policy Manual, Ch. 8 § 30.

48.     In order to assess the reasonableness and necessity of skilled nursing or

rehabilitation therapy services and determine whether reimbursement is appropriate,

Medicare requires as a condition of payment proper and complete documentation of the

services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> The Secretary shall periodically determine the amount which should be paid
> under this part to each provider of services with respect to the services
> furnished by it, and the provider of services shall be paid, at such time or times
> as the Secretary believes appropriate (but not less often than monthly) and
> prior to audit or settlement by the Government Accountability Office, from
> the Federal Hospital Insurance Trust Fund, the amounts so determined, with
> necessary adjustments on account of previously made overpayments or
> underpayments; *except that no such payments shall be made to any provider
> unless it has furnished such information as the Secretary may request in order
> to determine the amounts due such provider under this part for the period with
> respect to which the amounts are being paid or any prior period.*

42 U.S.C. § 1395g(a) (emphasis added).

**B.     CMS Issued Limited Waivers Of Certain Coverage Requirements To Ensure
Continued Benefits For Eligible Patients During The COVID Pandemic**

49.     On March 13, 2020, CMS issued its "Findings Concerning Section 1812(f)

of the Social Security Act in Response to the Effects of the 2019-Novel Coronavirus

(COVID-19) Outbreak" (referred to as the "COVID Waivers").

50.     The purpose of the COVID Waivers was to ensure that Medicare

beneficiaries did not have their coverage or benefits interrupted as a result of the

Coronavirus pandemic.  *See* "Medicare Fee-for-Service (FFS) Response to the Public

Health Emergency on the Coronavirus (COVID-19)," MLN Matters SE20011 (July 8,

2020) ("These waivers help prevent gaps in access to care for beneficiaries impacted by the emergency.").

51.    The COVID Waivers were issued under the authority of the Secretary of the Department of Health & Human Services to waive certain prerequisites for coverage if there is a finding that waiving such prerequisites "will not result in any increase in the total of payments made under [the Medicare program] and will not alter the acute-care nature of the [SNF benefit]." 42 U.S.C. § 1385d(f).

52.    The COVID Waivers made precisely these findings with regard to two separate prerequisites for the Medicare Part A SNF benefit.

53.    First, the requirement that a beneficiary have a 3-day hospital stay in order to obtain the SNF benefit was waived "for beneficiaries who experience dislocations or are otherwise effected by the emergency, such as those who are (1) evacuated from a nursing home in the emergency area, (2) discharged from a hospital (in the emergency or receiving locations) in order to provide care to more seriously ill patients, or (3) need SNF care as a result of the emergency, regardless of whether that individual was in a hospital or nursing home prior to the emergency." CMS has clarified that a beneficiary's status as being "affected by the emergency" for purposes of this waiver exists nationwide and does not have to be verified in individual cases.[2]

------

[2] "Medicare Fee-for-Service (FFS) Response to the Public Health Emergency on the Coronavirus (COVID-19)," MLN Matters SE20011 (July 8, 2020).

54.    Second, the requirement that a beneficiary "break their spell of illness" by being discharged to a custodial care or non-institutional setting for at least 60 days (called a "wellness period") before starting a new 100-day benefit period was waived "for certain beneficiaries who, prior to the current emergency, had either begun or were ready to begin the process of ending their spell of illness after utilizing all of their available SNF benefit days."

55.    As CMS explained in its publication "Long Term Care Facilities (Skilled Nursing Facilities and/or Nursing Facilities): CMS Flexibilities to Fight COVID-19," the COVID Waiver would not apply to waive the 60-day "wellness period" for patients with "a continued skilled care need (such as a feeding tube) that is unrelated to the COVID-19 emergency," since it would be the patient's continued skilled care rather than the Coronavirus pandemic that was preventing the patient from completing their 60-day "wellness period."

56.    CMS has explained the scope of this waiver as follows:

"In making such determinations, a SNF resident's ongoing skilled care is considered to be emergency-related *unless* it is altogether unaffected by the COVID-19 emergency itself (that is, the beneficiary is receiving the very same course of treatment as if the emergency had never occurred). This determination basically involves comparing the course of treatment that the beneficiary has actually received to what would have been furnished *absent* the emergency. Unless the two are exactly the same, the provider would determine that the treatment has been affected by – and, therefore, is related to – the emergency."[3]

_____

[3] "Medicare Fee-for-Service (FFS) Response to the Public Health Emergency on the Coronavirus (COVID-19)," MLN Matters SE20011 (July 8, 2020).

\*\*\*

"Please note, as previously stated, ongoing skilled care in the SNF that is **unrelated** to the PHE does not qualify for the benefit period waiver." Furthermore, providers must "Fully document in medical records that care meets the waiver requirements," and "must abide by all other SNF billing guidelines."[4]

57.     Taken together, these waivers are designed to "help restore SNF coverage that beneficiaries affected by the emergency would be entitled to under normal circumstances."[5] At the same time, they are designed <u>not</u> to increase costs to Medicare by expanding the SNF benefit to cover individuals that would not have qualified absent the Coronavirus pandemic.  In fact, it is only due to CMS's findings that the COVID waivers would not increase costs to Medicare that they were issued at all.

58.     Critically, nothing in the COVID Waivers removes the core medical necessity requirement for Medicare coverage that a billed service be reasonable and necessary for treatment of a patient's medical condition.  CMS explained the application of this principle to the COVID Waivers as follows:

Question: Can a positive COVID-19 test qualify a beneficiary (including a beneficiary who is currently receiving non-skilled services in a nursing home) for a covered Medicare Part A skilled nursing facility (SNF) stay?

Answer: A COVID-19 diagnosis would not in and of itself automatically serve to qualify a beneficiary for coverage under the Medicare Part A SNF benefit. ***That's because SNF coverage isn't based on particular diagnoses or medical conditions, but rather on whether the beneficiary meets the statutorily-prescribed SNF level of care definition of needing and receiving***

---

[4] *Id.*
[5] *Id.*

*skilled services on a daily basis which, as a practical matter, can only be provided in a SNF on an inpatient basis.*

"COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-For-Service Billing," CMS, at 100 (emphasis added).

59.    Indeed, the COVID Waivers could not, under law, waive the reasonable and necessary requirement for Medicare coverage that is mandated by statute:

> *We note there is nothing in guidance … that could be interpreted to permanently or temporarily waive the reasonable and necessary statutory requirement, which is expressed in section 1862(a)(1)(A) of the Act and cannot be waived under the section 1135 PHE waiver authority.* Except as expressly permitted by statute, we remind physicians, practitioners and suppliers that most items and services must be reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member to be paid under Part A or Part B of Title XVIII. *Physicians, practitioners, and suppliers are required to continue documenting the medical necessity for all services.* Accordingly, the medical record must be sufficient to support payment for the services billed (that is, the services were actually provided, were provided at the level billed, and were medically necessary.

CMS Interim Final Rule CMS-5531 IFC (Apr. 30, 2020) (emphasis added).

**C.    In Violation Of Medicare Coverage Requirements And The Text And Purpose Of The COVID Waivers, Defendants Billed Medicare Part A For Residents Who Did Not Require Skilled Care**

**1.    Renew Responded to the Issuance of the COVID Waivers by Treating Them as a Blank Check to Bill Medicare for Nearly Every Resident in its Facilities**

60.    Within one week of the issuance by CMS of the COVID Waivers, Renew began its fraudulent scheme to bill Medicare Part A for skilled nursing or therapy services for residents that had no skilled need and for whom Medicare does not provide coverage.

61. On March 17, 2020, discussions regarding the COVID Waivers began with Renew's Regional Director of Operations and Administrator of the Orinda facility, Darron Treude. Mr. Treude was provided with information about the COVID Waivers and was told that the purpose of the COVID Waivers was to ensure Medicare coverage for residents who require a skilled level of care but whose treatment is impacted by the COVID pandemic.

62. Specifically, Mr. Treude and others at Renew were told by their Medicare billing consultant that with regard to the COVID Waivers:

> *During this pandemic emergency the requirements for 3 day QHS* [Qualifying Hospital Stay] *and the establishment of a new benefit period has been waived under certain circumstances. These circumstances are very specific and we need to ensure that the resident meets the qualifications to be skilled under Part A first and foremost. Just having Medicare Part A is not an acceptable reason .... In any instance, we need a Dr's order, a cert*[ification] *and a SKILLED nursing need in order to cover someone under Part A. Therapy alone is not enough to satisfy this requirement. I would also strongly urge you to have Hershey* [Duimano, Renew's Utilization Review Nurse Consultant] *or someone from the clinical team review the chart of anyone we are picking up without a 3 day QHS.*

63. Pamela Shaw, Renew's Senior Vice President of Revenue Management, replied to the above email and stated "I could not have explained it better."

64. Mr. Duimano re-affirmed this concept in an email the following day, in which he stated that even with the COVID Waivers, "[w]e still need to meet the criteria for skilled services under medicare guidelines chapter 8.30.2.1. I will email it later." Chapter 8, Section 30.2.1 of the Medicare Benefit Policy Manual provides the general definition and standards for "skilled services," including that they be "furnished pursuant

to physician orders" and "[r]equire the skills of qualified technical or professional health personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech-language pathologists or audiologists."

65.    Nevertheless, on March 18, 2020, Mr. Treude requested to be provided with lists of all Medicare-eligible residents at Renew's facilities.

66.    During these conversations, Renew's Vice President of Marketing, Souheil Jawad, falsely stated that the COVID Waivers would allow Renew to bill Medicare Part A for every single Medicare-eligible resident on the basis that they were "under observation for COVID symptoms." He further stated without basis that "observation" at a SNF following discharge from a hospital is a "skilled need."

67.    These statements are entirely incorrect, as CMS has made clear that the standard for the Part A SNF benefit remains that a resident require a skilled level of care on a daily basis. CMS has stated in no uncertain terms that even a resident's positive diagnosis of COVID, without further clinical indications of skilled need, would be insufficient to meet this standard.

68.    By the end of March, Ms. Solorzano and the top management of Renew were participating in weekly "COVID Calls." These COVID Calls were attended by Renew's President of Operations, Chaim Kolodny, and its Chief Strategy Officer, Barbara Lillemon, among other corporate and regional managers.

69.    A consistent topic of discussion on these COVID Calls was the desire to "skill" all residents at all facilities. The majority of Renew's facilities, specifically those

in Southern California, had begun billing nearly all residents to Part A by the end of

March 2020.[6]

70.    If any facilities did not bill all Medicare-eligible residents to Medicare Part

A under the SNF benefit, the Renew employees associated with those facilities would be

questioned by upper management and pressured to do so.

71.    On April 2, 2020, Mr. Duimano announced that "[w]e are activating

observation period on all Orinda patients due to exposure to positive cases that we have,"

and that COVID tests were performed that day on all Orinda patients.

72.    Mr. Duimano explained the following day that pursuant to the COVID

Waivers, Medicare Part A SNF benefit periods were initiated for 25 residents at the

Orinda facility.  These patients were being "observed" by facility nurses and their test

results were not yet known.

73.    There is no provision in the COVID Waivers that would expand the

Medicare Part A SNF benefit to cover "observation" of residents who might have been

exposed to COVID.

74.    By the end of April 2020, all Renew facilities were engaging in this practice.

---

[6] One of Renew's Southern California facilities, Twin Oaks Assisted Living, was
initially licensed as an Assisted Living Facility, but Renew requested and obtained from
CMS an emergency license to recategorize this facility as a SNF for the purpose of
treating residents who tested positive for COVID.

75.    Renew management, in particular its business executives rather than clinical professionals, would give directives to employees to bill Medicare Part A for specific residents.  Mr. Treude would instruct facility Business Managers to "pick up" any resident with Part A eligibility irrespective of their clinical need for skilled treatment. Renew paid bonuses to its marketing and admissions teams based on the number of residents that their facilities bill to Medicare Part A.

76.    When Mr. Treude was asked for the justification for billing Medicare for these residents, he responded that they were "under observation for COVID," and would note that another resident in that facility might have exhibited COVID-like symptoms or that a staff member might have tested positive for COVID.  Neither of these conditions are sufficient for coverage under the Medicare Part A SNF benefit.

77.    Some Business Office Managers and other executives of Renew challenged the directives to bill Medicare Part A for all Medicare-eligible residents.  They were universally told that they are not clinical decision-makers, that "waivers are in place," and that they should stop asking about this practice and simply execute it.

78.    On April 29, 2020, Mr. Treude and others were asked whether any residents at the Redwood facility were being taken off the Medicare Part A SNF benefit, as many had been under "observation" for the prior two weeks.  Mr. Treude responded only, "I hope not."

79.    Renew has billed Medicare Part A for skilled nursing or therapy for residents when any condition arose that provided even a fig leaf of cover.

80.    For example, in July 2020, nine residents at the Redwood facility were billed to Medicare Part A when a kitchen staff employee tested positive for COVID.  The kitchen employee was placed on leave and none of the nine residents tested positive for COVID or exhibited any other clinical conditions that would warrant a skilled level of care.  Renew management placed these nine residents on the Medicare Part A census despite the objections from employees that the residents did not qualify for Part A coverage.

81.    Also in July 2020, Renew's Silicon Valley facility added 38 residents to the Medicare Part A SNF benefit in clear misapplication of the COVID Waivers.  When informed of this development, Ms. Shaw replied "I'm praying the waiver ends."

82.    On July 21, 2020, Renew's Medicare billing consultant expressed in no uncertain terms their concerns about the company's misuse of the COVID Waivers:

> *I am continuing to express my concern about picking up the patients who are NOT positive nor showing symptoms of covid just because a staff person at one facility is positive.  I am not sure that being potentially "exposed" to covid is a condition that requires a skilled level of care.  Also just because a resident has days available doesn't precipitate the start of a benefit period.  I am also concerned that it seems the residents who have days available are receiving "skilled" care because they have days available.  I learned yesterday that 5 additional residents were picked up at LM* [Lake Merritt facility] *effective last Thursday.  These are challenging times and we all need to communicate the changes in condition more efficiently to make this work.  Please understand that I am trying to make sure that we follow ALL of the Medicare guidelines when we are using the residents Medicare Part A benefit days....*

83.    On July 29, 2020, Mr. Treude emailed Renew colleagues about a particular patient at the Lake Merritt facility and directed that they "keep her skilled and maximize

the [Medicare] rate." This direction was given even though this patient's chart did not demonstrate any medical condition requiring daily skilled care and the only documented basis for billing Medicare Part A was "possible exposure" to COVID.

84.    Even after adding nearly all Medicare-eligible residents to Part A billing, Mr. Treude continued to express concern that the level of Medicare payments for these residents was too low.  It was explained to Mr. Treude that since "most of the custodial people don't have anything wrong with them" but were only being observed for potential COVID symptoms, the applicable Medicare reimbursement rates for those patients were lower than for patients with serious medical conditions.

85.    On September 10, 2020, Ms. Shaw wrote to Mr. Treude and others that the proper course of action to place a resident on the Medicare Part A SNF benefit was to determine if that patient had already exhausted their benefit days and, if not, to have a clinical team determine if that patient met Medicare's medical necessity requirement of requiring skilled treatment on a daily basis.  She stated bluntly, "We cannot run eligibility on every ... patient who has Medicare insurance in the building.  I'm sure you can understand the ethical implications of this."

86.    Mr. Treude did not respond to Mr. Shaw's email other than directing that a list containing "all residents" be provided to determine which residents had Medicare benefit days remaining.  One of the recipients on this email who worked at Renew's Orinda facility replied, "Really, the list that was given was everybody. That's ... seriously the list. How is that possible?"

87.    Again, Mr. Treude did not respond with any acknowledgment that a patient

must actually require skilled services in order to bill Medicare for those services.  Instead,

he clarified that he wanted Medicare eligibility to be checked "for all nor[thern]

cal[ifornia] facilities."

88.    Certifications that Renew residents required a skilled level of care on a daily

basis were made by the Medical Directors at each facility.  Renew management exerted

pressure on these physicians to certify that nearly all residents required a skilled level of

care on a daily basis.  Because these physicians received their compensation as Medical

Directors from Renew, they were susceptible to Defendants' pressure to go along with

this scheme.

89.    For example, the Medical Director at Renew's Redwood facility is Dr. Ng.

Dr. Ng was pressured to sign certifications by Mr. Treude and others at Renew, and

sometimes backdated his certifications to allow Renew to bill Medicare Part A for earlier

periods.  Dr. Ng knew that many of Renew's residents did not require skilled treatment

and at one point refused to sign fraudulent certifications.  However, after Renew's

corporate management spoke with Dr. Ng, he signed blank certifications that could be

and were modified to reference specific patients, many of whom had already been

designated by Renew for billing to Medicare Part A.

90.    In one specific episode, Dr. Ng initially signed certifications for five

residents at Redwood that tested positive for COVID but did not have any symptoms,

while refusing to certify residents that tested negative for COVID.  When informed of

this, Mr. Treude responded "He was supposed to sign all, it was already discussed with him." Dr. Ng later signed certifications for the remaining residents, but these certifications were blank, meaning that they did not include a date or any medical justification for Part A coverage.

91.    Individual resident treatment plans were developed by the therapists that treated Renew's residents. These therapists were employed by an outside skilled therapy company and also had a financial incentive to go along with the scheme since this company was paid by Renew a per diem amount for each resident that received skilled treatment.

92.    When the COVID pandemic surged again in 2021, Renew took advantage of the opportunity to continue its fraudulent scheme.

93.    As just one example, Renew has used a single positive COVID test of an asymptomatic staff member as the reason for billing all residents of that facility as requiring and receiving skilled services.

### 2.    Renew Has Kept a Record of the Approximately 900 Residents for Whom It Fraudulently Billed Medicare

94.    In recognition of the fact that the residents added to the Medicare Part A census on account of the COVID Waivers did not actually have the medical conditions that would support billing for the Part A SNF benefit, Renew has kept a record of these residents on an Excel spreadsheet that it refers to as a "COVID Log." Renew has

instituted this tracking mechanism to ensure that it receives reimbursement from

Medicare for each of these residents.

95.    As of the filing of the initial complaint in this action, Renew's COVID Log

listed approximately 900 residents.

96.    The COVID Log contains a column for "Detailed Notes" for each listed

resident, which can indicate the reason their treatment was billed to Medicare Part A.

Because virtually none of these patients had a legitimate skilled medical need, the notes

often contained phrases such as:

- "No COVID-19 symptoms"
- "for possible COVID-19 exposure monitoring"
- "For observation due to covid exposure"
- "Observation"
- "Monitoring in house due to positive CNA test"
- "skilled in place"
- "COVID-19 exposure in facility"
- "picked up under waiver"
- "Enhanced monitoring"
- "14 day observation"
- "2nd 14 day observation"
- "covid exposure – pending test results"

97.    Not a single one of the above conditions comes remotely close to satisfying

the medical necessity requirement of the Medicare Part A SNF benefit that a patient

require a skilled level of care on a daily basis.

### 3. Renew Separately Obtained Over $40 Million from CMS under COVID-Related Programs

98.     Separate from and in addition to the revenue that Renew has fraudulently obtained from Medicare Part A, Renew has received federal funds from three other sources on account of the COVID pandemic.

99.     First, in April 2020, Renew obtained approximately $21 million from CMS in the form of prepayments for future Medicare services.[7]  CMS made these prepayments because of its expectation that many healthcare providers would suffer a decrease in their operating revenue as a result of the COVID pandemic.  However, as a direct result of its fraudulent practices, Renew's Medicare revenue dramatically *increased* during the COVID pandemic.

100.     Second, Renew and the facilities under its ownership or control have obtained over $14 million in federal loans through the Paycheck Protection Program ("PPP").  PPP loans may be forgiven by the federal government if certain conditions are met.

101.     Third, also in April 2020, Renew obtained approximately $10 million from CMS under a program designed to provide financing for SNFs to obtain personal

---

[7] These payments were made under the "Accelerated and Advance Payment Program," which was expanded as a result of the COVID pandemic and new funding provided by the CARES Act.

protective equipment (PPE) and other resources required as a result of the COVID pandemic.[8]

102.   This $10 million payment from CMS further illustrates that the purpose of the COVID Waivers was <u>not</u> to provide SNFs with additional revenue on account of COVID-related costs.  CMS instituted and used a separate program to accomplish that policy goal and Renew applied for and received $10 million in federal funds to pay for COVID-related costs.

103.   The COVID Waivers were instead directed at ensuring that beneficiaries who required a skilled level of care on a daily basis would receive that care, despite not meeting the qualifying hospital stay or "spell of illness" requirements for coverage.  The COVID Waivers were not a blank check to bill Medicare Part A for every Medicare-eligible resident of a SNF during the COVID pandemic.  Ms. Solorzano and others in Renew's top management knew this fact and fraudulently billed Medicare for millions of dollars under the Part A SNF benefit in blatant disregard of its coverage requirements.

## VI.   COUNTS

### <u>Count I</u>
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

104.   Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

---

[8] These payments were made under the "CARES Act Provider Relief Fund."

31

105.   By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

106.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

107.   Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

108.   By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

109.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

110.   Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

111.   By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

### Count IV
### California False Claims Act
### Government Code § 12651(a)(1)

112.   Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

113.   By virtue of the acts described above, Defendants have knowingly presented or caused to be presented to the State of California false or fraudulent claims for payment in violation of the California False Claims Act, Cal. Gov. Code § 12651(a)(1).

114.   As a result of Defendants' violations of Cal. Gov. Code § 12651(a)(1), the State of California has suffered damages in an amount to be determined at trial.

### Count V
### California False Claims Act
### Government Code § 12651(a)(2)

115.   Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

116.   By virtue of the acts described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to claims for payment to the State of California in violation of the California False Claims Act, Cal. Gov. Code § 12651(a)(2).

117.  As a result of Defendants' violations of Cal. Gov. Code § 12651(a)(2), the State of California has suffered damages in an amount to be determined at trial.

### Count VI
### California False Claims Act
### Government Code § 12651(a)(7)

118.  Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

119.  By virtue of the acts described above, Defendants have knowingly made, used, or caused to be made or used false records material to an obligation to pay or transmit money to the State of California, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of California in violation of the False Claims Act, Cal. Gov. Code § 12651(a)(7).

120.  As a result of Defendants' violations of Cal. Gov. Code § 12651(a)(7), the State of California has suffered damages in an amount to be determined at trial.

### Count VII
### California False Claims Act
### Government Code § 12651(a)(8)

121.  Relator re-alleges and incorporates each allegation in paragraphs 1 through 103 as if fully set forth herein and further alleges as follows:

122.  By virtue of the acts described above, Defendants were the beneficiaries of the inadvertent submission of false claims and, upon subsequently discovering the falsity of the claims, failed to disclose the false claims to the state of California within a reasonable time, in violation of Cal. Gov. Code § 12651(a)(8).

123.   As a result of Defendants' violations of Cal. Gov. Code § 12651(a)(8), the State of California has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator demands that judgment be entered in favor of the United States and the State of California and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

Further, Relator requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States or the State of California, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated:  January 19, 2022

Respectfully submitted,

ZIMMERMAN REED LLP

By: _____

Caleb LH Marker (SBN 269721)
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Caleb.Marker@zimmreed.com

Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
COHEN MILSTEIN SELLERS & TOLL PLLC
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: (267) 479-5700
gazorsky@cohenmilstein.com
jmarkey@cohenmilstein.com
rsarola@cohenmilstein.com

Michael J. Brevda
David J. Brevda
SENIOR JUSTICE LAW FIRM
7700 Congress Avenue
Suite 3216
Boca Raton, FL 33487
(561) 717-0813
michael@seniorjustice.com
david@seniorjustice.com
eservice@seniorjustice.com

Carolyn G. Anderson
June P. Hoidal
Charles R. Toomajian III (SBN 302153)
ZIMMERMAN REED LLP
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
Telephone: (612) 341-0400
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Charles.Toomajian@zimmreed.com

*Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that I will cause a copy of the above First Amended Complaint to be served on the following counsel by certified U.S. mail, return receipt requested:

The Honorable Merrick B. Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

The Honorable Tracy L. Wilkison
Acting United States Attorney for the
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, California 90012

Civil Process Clerk
United States Attorney's Office
Federal Building
300 North Los Angeles Street
Suite 7516
Los Angeles, California 90012

The Honorable Rob Bonta
Attorney General of California
Office of the Attorney General
Attn: False Claims
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022.

_____
Caleb LH Marker